## Bliss *v.* Bliss, Appellant.

Argued April 13, 1950. Before RHODES, P.J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Henry Kauffman*, with him *Louis Little*, for appellant.

*Maurice H. Goldstein*, for appellee.

OPINION BY DITHRICH, J., July 20, 1950:

The failure of this marriage, which culminated in plaintiff's obtaining a divorce decree on the ground of indignities, can be traced to an inordinate desire on the part of defendant for a night life of gaiety, which she preferred to staying at home with her husband and their two small children. Although plaintiff admittedly was a good provider, except as to clothing for herself and the children, and was earning on an average upwards of $4,000 a year, defendant in the summer of 1946 went to work as a waitress in a licensed restaurant or cafe. Her hours were from 4, 5 or 6 p.m. to 1, 2 or 3 a.m. She engaged her sister to stay with the children, a five-year-old girl and a two-year-old boy, until their father got home from work, usually about 5:30 p.m.

The first he knew that his wife had gone to work was when he returned home one evening and found a note from her telling him what she had done. He waited up for her to come home that night, or early the following morning, and told her "Stay home and raise the children . . . I am providing for this home." But she continued to work and at the time of the trial had advanced to the position of hostess in another cafe. She not only neglected her household duties for the cafe life, which was more to her liking, but frequently returned home "drunk and disorderly" anywhere from 3 to 5 o'clock in the morning.

Plaintiff's mother testified that on an occasion when she was visiting them when their first-born child was about two years old, defendant "was terribly drunk . . . stripped herself of all her clothes . . . and . . . was standing nude and her little girl was looking at her." Her husband took a Turkish towel and put it around her, but she threw the towel away and got as far as the bathroom where she fell down and had to be put to bed.

Plaintiff testified that one morning in the summer of 1947 defendant returned home from work intoxicated and when he went to open the door for her ". . . there she was, her blouse all open. No shoes. Hair all mussed up, and she staggered in and fell on the floor. I put her to bed." He further testified that she came home intoxicated often—on an average of two or three times a week—that he asked her to quit working and "even went down to see her boss. He said it was up to her."

Finally on November 6, 1947, he received a telephone call between 2 and 3 o'clock in the morning to "Watch and keep watching." He dressed and did as he was told. About 3 o'clock his wife was brought home in an automobile and when plaintiff demanded to know who had brought her home, she cursed him and tried to kick him in the groin. He tussled with her and as a result he was arrested two days later on charges of assault and battery, surety of the peace, and nonsupport. When he returned home, after being released on bail, he found that the "door lock had been changed." He has not since lived with his wife but is supporting the children.

The following excerpt from defendant's testimony is strongly indicative of her attitude toward, and her feeling for, her husband and the children: "Q. Who took care of the children when they were sick, at night? A. He was home at the time they had whooping cough. Q. You continued working? A. I had to. I had a job and had to go to work. . . . Q. But he . . . stay[ed] at

home and . . . [took] care of the children when they were sick? A. I don't know whether he was at home or at a saloon—" And apparently she didn't care. She "had a job" and seemingly she put that ahead of the duty and care she owed her children and her husband.

The learned judge of the court below said: "We think it is difficult to adequately explain or defend the action of the wife in leaving infant children at home and taking a position as a waitress in a restaurant and saloon." We will go further and say that in our opinion, there being no apparent necessity for her taking up such work, she did it solely as a means of escape from spending her evenings at home. To a person of her tastes, that was a humdrum life and she was willing to work for the privilege of getting away from it. She attempts to defend her cafe life by saying that she was forced into it because her husband, after paying the rent and providing for the table, drank up all he made. Even if that were true, and it was denied by plaintiff, of whom the learned trial judge said, "we regard the plaintiff as the more credible witness," a statement with which we agree, it would not excuse her conduct after working hours. In accord with the rule that when witnesses who are competent and equally interested flatly contradict each other, the conclusion of the judge who heard them as to which is to be believed is not to be lightly disturbed, the Supreme Court and this Court "have at times resolved doubt in dealing with conflicting testimony, by relying on expressed or implied conclusions of the trial judge": *Wick v. Wick,* 352 Pa. 25, 28, 42 A. 2d 76; *Spence v. Spence,* 167 Pa. Superior Ct. 248, 74 A. 2d 495. That she is inclined to exaggerate, to put it mildly, is further evidenced by her testimony that "He drank . . . all day long . . . That was an everyday occurrence." How that could be when plaintiff was steadily employed as an asbestos worker, a job that frequently required him to climb smokestacks or pipes to a height of 150

256

feet, is well-nigh incredible. The learned trial judge found as a fact that: "The plaintiff was a moderate drinker but never drank to such excess as to interfere with his daily work, or which left him unable to take care of his children during the evenings and nights when his wife was absent." She was absent five nights a week. There is sufficient testimony to support the finding.

In our opinion plaintiff, while not altogether fault-less, is "the innocent and injured spouse" within the meaning of §10 of The Divorce Law of 1929, May 2, P. L. 1237, as amended March 19, 1943, P. L. 21, 23 PS §10.

The indignities which he suffered and which he proved by a preponderance of the evidence were not provoked by him and could not reasonably be prevented by him. *Verbeck v. Verbeck,* 160 Pa. Superior Ct. 515, 52 A. 2d 241; *Callen v. Callen,* 165 Pa. Superior Ct. 161, 67 A. 2d 609. He did all he reasonably could to keep his wife from going out to work at night, the chief source of friction between them. She herself made it abundantly clear that she would rather do that than spend her evenings at home.

Decree affirmed.